Filed 4/3/13  In re Raymond A. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re RAYMOND A., a Person Coming Under the Juvenile Court Law. | B243103 |
| | (Los Angeles County Super. Ct. No. CK83294) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RAMONA A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Affirmed.

John Cahill and Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

The juvenile court declared two-year-old Raymond A. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b)[1] and ordered reunification services for the child's mother. Over the next 18 months, mother repeatedly used methamphetamine, was arrested on multiple occasions and failed to comply with the court's case treatment plan. The juvenile court terminated reunification services and set a hearing on the termination of parental rights pursuant to section 366.26.

On the morning of the section 366.26 hearing, mother filed a section 388 petition arguing that the juvenile court should reinstate reunification because she had completed a drug treatment program and obtained housing. The juvenile court summarily denied the petition, terminated parental rights and selected adoption by maternal grandparents as the child's permanent plan.

Mother appeals the juvenile court's orders, arguing that: (1) she was entitled to a hearing on her section 388 petition; and (2) the juvenile court erred by not applying the beneficial parental relationship exception to parental termination. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*A. Events Preceding DCFS's Section 300 Petition*

In November of 2009, DCFS received a referral alleging "general neglect by" Ramona A., the mother of two-year-old Raymond A.[2] The referral alleged that mother was using drugs and reported that Raymond had been bitten by a dog. During a voluntary "Up Front Assessment,"[3] mother, then 26, informed a social worker that she

---

[1] Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

[2] The child was born December of 2007.

[3] According to DCFS, "Up Front assessments are conducted on behalf of DCFS by Family Preservation agencies to obtain objective information on the families served by DCFS. The assessments are voluntary and focus on caretaker capacity."

2

had a history of using marijuana and methamphetamine and that her son had been "severely bit[ten] by the family dog." Mother also admitted that she had experienced serious depression, serious anxiety and had been previously hospitalized in a psychiatric facility.

Mother agreed to participate in a "voluntary family maintenance" plan (VFM plan) that included random drug testing, drug rehabilitation and individual counseling. Between November 2009 and May 2010, mother passed two drug tests and missed six others. Mother also failed to attend any of the drug treatment services to which she had been referred.

In June of 2010, a team decision meeting (TDM) was held to address mother's refusal to comply with the VFM plan. Mother was informed that "a missed [drug] test was a dirty drug test and if she failed to comply with the case plan, her child would be taken from her custody and placed with her parents." Mother agreed to enroll in an out-patient drug treatment program within one week, continue drug testing and begin individual counseling. Although mother was given another referral to a drug treatment center, she did not attend the program and missed three drug tests in June and July.

On July 19, 2010, DCFS visited the mother, who lived with her parents (the child's maternal grandparents), and took the child out of her custody. DCFS informed the mother that it was placing the child in the custody of the maternal grandparents and that she had to leave the home.

### B. Section 300 Petition and Detention Hearing

On July 21, 2010, DCFS filed a petition alleging that Raymond A. fell within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b). The petition included two allegations under subdivision (b). The first allegation stated that mother "has a five year history of substance abuse, including amphetamine, marijuana and alcohol, which renders the mother incapable of providing regular care and supervision of the child. The mother has a criminal record of a conviction of Possession Of Controlled Substance Paraphernalia. . . . The mother's substance abuse endangers the child's

3

physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

The second allegation asserted that mother "has mental and emotional problems including a diagnosis of Major Depressive Disorder, Recurrent with Anxiety Disorder Features, which render the mother incapable of providing regular care and supervision of the child. On prior occasion, the mother was hospitalized for the evaluation and treatment for the mother's psychiatric condition. The mother's mental and emotional problems endanger the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

In support of the petition, DCFS filed a detention report that summarized mother's failure to comply with the prior VFM plan. The detention report stated that although mother lived with the maternal grandparents, she had left the home and her whereabouts was unknown. Mother had previously informed a social worker that she was unsure of the father's identity because she was "involved with two men . . . and d[idn't] know who the father was." According to the maternal grandfather, the child had "always been living in their home, so there [would be] no adjustment problem for the child."

The report also indicated that, between January of 2005 and September of 2007, mother had been arrested six times, resulting in felony convictions for burglary and false impersonation and a misdemeanor conviction for possession of controlled substance paraphernalia. The remaining three arrests included two drug charges, which were both dismissed in the interests of justice, and a grand theft charge for which no disposition was reported.

DCFS concluded that, based on mother's "non compliance with her VFM case[,] there [was] a 'high' risk of future abuse" and recommended "continued detention and placement of the child" with the maternal grandparents.

At the detention hearing, the court appointed separate attorneys for Raymond and his mother. The mother agreed to "submit on detention" and the maternal grandparents confirmed that they were willing to adopt the child if the mother and father were unable to "do what they need to get the child back."

4

The court ruled that there was prima facie evidence that the "child [was] a person described by Welfare and Institutions Code 300 section (b)" and ordered that the child was to remain "detained with the maternal grandparents . . . pending disposition." The court ordered DCFS to provide "family reunification," including monitored visitation, and to "present due diligence in attempting to locate Father." The court then set the matter set for a contested jurisdictional and dispositional hearing.

### C. Jurisdictional Hearing

#### 1. Summary of the "Jurisdictional/Disposition Report"

On August 23, 2010, DCFS filed a "Jurisdiction/Disposition Report" summarizing various interviews that had been conducted since the detention hearing. DCFS had scheduled to meet with mother at the maternal grandparents' home, where mother had resided for all "26 years of her life [with] . . . four biological sisters." However, when DCFS arrived for the interview mother was not present. The maternal grandmother told DCFS that she believed mother was "currently sleeping in her car for shelter."

The maternal grandmother also informed DCFS that, on August 10, 2010, mother had broken into the maternal grandparents' home by breaking a window and disarming the alarm. Mother took a shower and ate some food before her sister told her to leave the premises. Mother initially refused to leave and then stole the sister's car battery and various items of clothing. The maternal grandmother told DCFS that she had contacted the police, who were investigating the matter, and that the mother had not returned to the home since the break-in.

When DCFS asked the maternal grandmother why she "felt that her daughter" had broken into the house, she responded "'Because she's on drugs and has mental health issues.'" The maternal grandmother also stated that mother "would bring her boyfriend into the home and they would fight constantly and argued and it was dangerous for the [child]." Maternal grandmother reported that mother had bruises on her arms "because [her boyfriend] beats her up and she spends all her [welfare] . . . money on him to buy drugs."

When asked how the child was "adjusting to his placement," the maternal grandmother stated that "'he doesn't know the difference because I was always taking care of him anyway. His mother would run off so much and leave for days without checking on him. Even now she barely visits and when she does she just wants to take a shower, eat and barely looks at [the child].'"

The maternal grandmother also stated that she had never contacted DCFS regarding the child because mother "would threaten to take her grandson and leave the home and never return if she attempted to report her." Mother also "threatened to take [the child] away from the family if [the maternal grandmother] showed any social workers [mother's] room, which [wa]s located outside of the home, attached to the garage." The maternal grandmother permitted DCFS to enter mother's room, where a social worker observed "a broken window, rotten food, trash and hazardous poisons such as roach spray out in the open. [The social worker] also observed empty beer bottles, dirty clothes piled up in the corner and empty water bottles filled with urine."

The maternal grandmother reported that mother had "severe mental health issues, including having violent outbursts, mood swings, and depression." She also alleged that mother could be "'dangerous at times,'" and believed that mother's substance abuse was "related to her lack of mental health treatment." According to the maternal grandmother, mother "continue[d] to use methamphetamine and alcohol and [wa]s in desperate need of a substance abuse program."

DCFS also interviewed a "Family Preservation Worker" who had overseen the mother's VFM plan prior to the child's detention. The worker told DCFS that it was "unfortunate what happened . . . especially because we offered the mom . . . so much help. She just continued to promise and promise to complete her programs and rarely followed through with anything."

Although DCFS was not able to interview the mother, the detention report indicated that mother had previously told a Family Preservation social worker that she experienced "feelings of depression, anxiety and trouble controlling violent behavior. [She] also reported having a seven year history of mental health issues which include[d]

attempted suicide, anxiety depression, and psychiatric hospitalizations." Mother admitted "to having a history of using methamphetamine and marijuana," but stated that she did not have "any problems . . . in terms of addiction, and stated that she [did] not see a need for alcohol or drug treatment."

The DCFS report also stated that the child "ha[d] . . . adjusted very well to his current placement residence and appear[ed] to be very attached to his maternal grandparents."

In its assessment and evaluation, DCFS concluded that, since November of 2009, mother had been "offered 9 months of voluntary services through DCFS and ha[d] failed to comply with drug testing, substance abuse recovery and other services for the entire 9 months. . . . [Mother] . . . continued to make false promises and insist[ed] that she [wa]s being treated unfairly by [DCFS] despite multiple efforts and interventions from DCFS and Family Preservation to assist . . . with her addiction and mental health issues." DCFS recommended that the juvenile court declare the child a dependent of the court and provide reunification services, including "random drug testing, inpatient substance abuse treatment and individual counseling to address mental health and domestic violence issues."

A jurisdictional hearing was held on September 1, 2010, but the mother failed to attend. Although the court allowed three continuances, mother failed to attend any of the hearings. At a hearing on October 7, 2010, mother's attorney reported that he had provided mother oral and written notice of the hearing and was unsure of her whereabouts. The attorney requested one final continuance, but the trial court denied the request, explaining that mother had "many opportunities and has been given notice before."

After receiving the detention and jurisdictional reports, the court ruled that "the petitioner ha[d] met their burden by a preponderance of evidence as to mother. B-1, B-2 of the petition will be found to be true as sustained." The court declared the child a dependent of the court and ordered mother to complete "a drug rehabilitation program with random testing, weekly;" "a parenting education course"; "individual counseling to

7

deal with mental health issues" and "domestic violence" counseling. The court declined to provide the child's father reunification services because DCFS had been unable to locate him.[4] The court allowed mother three monitored visits per week and set a six-month reunification review hearing pursuant to section 366.21, subdivision (e).

### D. Interim Status Hearings

#### 1. Section 366.21, subdivision (e) six-month review hearing

On April 1, 2011, DCFS provided a status report for the six-month review hearing. The report stated that mother had been incarcerated in October of 2010 and had remained in custody until March of 2011. While in prison, mother had "sought out programs to help her complete with Court orders." However, following her March release, mother had not "enroll[ed] in any Court ordered programs." DCFS reported that although mother displayed "emotions in regards to her . . . case[,] . . . she ha[d not] address[ed] these issues formally in therapy" and continued to behave in a disrespectful manner when visiting the maternal grandparents' home.

DCFS also reported that Raymond, then three-years-old, was developmentally "on-track", "very smart" and "loved to talk." Although the maternal grandparents took the child to visit his mother in prison every other week, the visits caused the child to cry and have "difficulty sleeping." After the visits, the child would "state that . . . mommy didn't love him or want[] to be with him."

To address these issues, the child began receiving "in-home therapy" in March of 2011. The in-home therapist informed DCFS that the child was "not doing well . . . because he has separation anxiety and is in a frenzy from his mother being in and out of his life so often." The therapist further reported that, following her release from prison, mother frequently visited the child in the maternal grandparents' home. According to the therapist, however, the visits were "not . . . very strong" because mother "w[ould] come

---

**4**      The DCFS provided the court a declaration of due diligence report summarizing the efforts it had taken to locate the father and confirming that it had been unable to determine his whereabouts. The father has not participated in any portion of the dependency proceedings and is not a party to this appeal.

to the house and talk on the phone and not devote all of her attention to her son." DCFS observed several of these in-house visits and concluded that mother and child appeared to "have a strong bond" and that mother displayed a "loving [attitude] towards [the child.]"

DCFS conducted a risk assessment that "yielded results of very high" and recommended that the court order "6 additional months of Family Reunification Services." The court entered an order continuing jurisdiction over the child and leaving the case plan in effect.

### 2. *July 2011 interim report*

On July 6, 2011, DCFS filed an "Interim Status Report" informing the court that, on May 20, 2011, a TDM was held to "address visitation issues and [mother's] lack of compliance with the case plan." Although mother was informed of the meeting and was offered transportation, she did not attend. At the TDM, it was decided that mother would be "referred to additional in-patient rehabilitation programs" after having been discharged from her current program "for lack of participation." The report indicated that, since April, mother "ha[d] remained homeless and [wa]s . . . not participating in any of Courts orders." DCFS met with mother and offered to enroll her in a rehabilitation program in Pomona. Mother became "upset," stated that DCFS could not "make her" attend an out-patient program and "stormed out of the building."

DCFS also reported that mother's "visitation [rights] had been changed . . . due to an incident that took place at the home in which [mother] threatened to kill her younger special needs sister and physically attacked her." DCFS reported that this behavior was consistent with other "violent outbursts" it had observed, which frequently "occur[red] in the presence of the child." After the incident with mother's sister, DCFS required that the visits occur in a nearby park. However, "the visits at the park . . . also resulted in angry outbursts and [mother] becoming very emotional and crying and screaming at end of the visits which upset [the child]." At the TDM, it was decided that the visits should occur at the DCFS office, under the supervision of a social worker. A DCFS social worker had monitored three in-office visits and was "constantly" forced to tell mother

9

"that she is not to become emotional in front of her son as he starts crying and has a difficult time."

In its assessment and evaluation, DCFS concluded that mother had "declined severely since her release from jail." Although mother denied using drugs, she exhibited signs of methamphetamine abuse, including scabs on her face and dark circles under her eyes. Mother also displayed extreme "mood swings" and "highly irregular" behavior that included "violent and unpredictable" outbursts. According to DCFS, mother "d[id] not display a desire to stop using drugs and claim[ed] to not be using drugs . . . Further she ha[d] failed to provide any drug tests to [DCFS,] . . . was terminated from her substance abuse program due to her lack of participation" and remained "out of compliance with her Court ordered case plan." DCFS requested that the court issue a restraining order prohibiting mother from the maternal grandparents' residence and recommended that it terminate reunification services and set a section 366.26 hearing for termination of parental rights.

At the status hearing, which the mother did not attend, the child's maternal grandparents confirmed that they were willing to adopt the child. The court ordered DCFS to initiate an adoptive home study on the grandparents and required that all future visits between mother and child occur at a DCFS office. A twelve-month permanency hearing was set for October 7, 2011. (See § 366.21, subd. (f).)

### 3. *Section 366.21, subdivision (f) permanency hearing*

On October 7, 2011, DCFS provided a status review report for the 12-month permanency hearing. DCFS stated that, since July, mother had been arrested again and was temporarily placed in jail. In addition, mother had broken into the maternal grandparents' house again in August; in mid-September, "the family was forced to call the police to remove [mother] from their property." The maternal grandmother reported that she occasionally saw mother "away from the family home" and suspected that she was homeless and "using." Mother had not visited the child or contacted DCFS for almost three months.

10

As the child, DCFS reported that Raymond was "thriving in the home of maternal grandparents . . ., attending daycare daily and . . . doing well there. . . . [H]e makes friends easily and is well behaved." The child's in-home therapist reported that the child was "making good progress and . . . adapting well in his grandparents home." DCFS stated that although it had not completed its adoption home study, it was apparent that the grandparents "love[d] Raymond very much . . . and have cared for him in their home since he was born. They are attached to him and are committed to meeting his needs on a permanent basis through adoption. . . . [He] turns to his grandparents for love and support."

DCFS concluded that mother had made little if any progress since the July status report, explaining: "[mother] has had 12 months to reunify with her son, she shows no insight to the issues that brought her to the attention of the Department and displays paranoia and erratic behavior. . . . [T]he Department believes [mother] will continue to be uncooperative and disruptive to her son and at this time a permanent adoptive plan is more appropriate for the [child]."

At the 12-month reunification review hearing, which occurred on November 2, 2011, mother's attorney announced that mother, who was not in attendance, had completed a "detox program" and was "currently in a residential treatment program." The court set a contested 18-month permanency review hearing for January 18, 2011. (See § 366.21. subd., (g)(1).)

    4. *Section 366.21, subdivision (g) 18-month permanency review hearing*

On January 5, 2012, DCFS submitted a status report for the 18-month permanency hearing stating that mother had admitted herself to the "American Recovery Center" in October of 2011 and completed a one-month detoxification from methamphetamine use. Mother intended to remain at the center for three more months and then "transition into a sober living home." During an interview in December of 2011, mother told DCFS she

11

had "cleared up" a warrant issued in September related to methamphetamine.[5]  According to the social worker, mother looked "healthier and appeared to be sober," but had still failed to obtain a court-ordered "730 [mental] evaluation."[6]

DCFS also submitted a letter from the American Recovery Center stating that mother "appear[ed] motivated for treatment" and had made "more than adequate progress."  The letter reported that mother was actively participating in treatment, had "proven to be a responsible person" and "appear[ed] sincere regarding her desire to parent her son."  The letter also stated that mother's drug tests had all been negative and that she had "completed addiction education, rational thinking, relapse prevention anger management, seeking safety and more."

Following her detoxification program, mother had begun having weekly, monitored visits with the child at the recovery center.  The maternal grandparents reported that although mother was "appropriate during [these] visits for the most part," she occasionally "display[ed] irrational behavior."  The grandparents explained that, during a recent birthday party for Raymond, mother "left . . . in tears with [the child] in her arms because she was upset that maternal grandmother had purchased a similar gift."  Mother requested unmonitored visits with the child, but DCFS denied the request because it believed her "behavior remain[ed] irrational and unpredictable."

As to Raymond, DCFS reported that the child continued to "do[] well in the [grandparents'] home and [wa]s bonded to caregivers."  The grandparents told DCFS that the child was "doing much better," was "happy" and had no problems with eating or sleeping.  His in-home therapy, which had begun in March of 2011, was terminated in December.  The child's therapist provided a letter explaining that Raymond had "initially presented with anxiety symptoms related to his experience of child endangerment.  He

**5**     During an interview in October of 2011, the maternal grandmother told DCFS that mother "had a warrant out for her arrest" and that detectives had "come to the home looking for her."  The maternal grandmother suspected that mother had entered the rehabilitation program "to avoid getting ar[r]ested."

**6**     Evidence Code section 730 permits a trial court to appoint an expert to investigate, render a report, and testify to a matter for which expert evidence is required.

demonstrated poor affect regulation, was preoccupied with concern that his mother might not love him, and feared being separated from his caregivers." During Raymond's nine months of therapy, the maternal grandparents were "coached to identify ways to soothe [the child] and create an emotionally and physically safe environment for the child. . . . Roles of his various family members were clarified in order to ensure that child attachment needs were met. . ." The therapist asserted that Raymond's "individual treatment needs ha[d] been met" and that he was now "much less anxious and preoccupied with concerns about his mother's love, and has secure relationships with family members who meet his social emotional and developmental needs."

In its assessment and evaluation, DCFS stated that although mother had "been in rehabilitation for 3 months, [the Department] remained concerned that [she] had 18 months to receive services and[,] once released from jail, . . . waited too long to begin receiving services and instead of going to a rehab program . . . she began to use again and bounced from friends home to friends home." DCFS also believed mother's behavior "remain[ed] erratic and unpredictable," noting that she still "act[ed] out in front of her son . . . which [wa]s upsetting to him." DCFS also expressed concern that mother: continued to "display paranoia [that her family] [was] trying to take the minor from her"; "t[ook] no responsibility for the circumstances that brought her into the Court"; blamed her drug use on the fact that her child was removed from her custody; and had not explained where she intended to go after being released from the rehabilitation program. In light of these concerns, DCFS recommended that the court terminate reunification services and set a section 366.26 hearing.

At the 18-month review hearing, the juvenile court indicated that it was "inclined to terminate reunification services" because the child had been detained for "18 months . . . and [mother has] just been in the inpatient for three months." DCFS argued that termination was appropriate given that mother had been in several "prior programs and failed them." It further asserted that although mother was "complying now with the order for drug treatment," she had failed to comply with "mental health and domestic violence" services.

13

Mother's attorney, however, argued that she should be provided additional time to reunify, stating: "the fact that 18 months has passed isn't necessarily relevant when she's doing exceptionally well now, and she's working her programs. So I would ask the court to reconsider [its] tentative and provide the mother with additional time to reunify."

The court terminated reunification services and set the matter for a section 366.26 hearing, explaining: "I think granting the mother further reunification services is punitive to this four-year-old child . . . The mother has repeatedly failed programs and to find now that she is in an inpatient program for three months that there's any likelihood of it being different this go-round because its inpatient versus outpatient is a fallacy and would be punitive to the child to delay permanence."

### E. Mother's Section 388 Petition and the Section 366.26 Hearing

#### 1. Section 366.26 hearing report

On April 27, 2012, DCFS filed a report for the section 366.26 hearing. In assessing Raymond, DCFS concluded that child was "happy," "talkative, "active" and "very comfortable with his caregivers," who he "s[aw] . . . in the role of parents." DCFS reported that Raymond was "the only minor child in a home with four adults and therefore gets a lot of attention and has all of his basic needs met. He appears well adjusted and comfortable in the home and with his caregivers. He was reported to have healthy eating and sleeping habits and does not exhibit emotional or behavior problems." DCFS also reported that "[t]he minor ha[d] resided in the 'caretakers] home since he was born. They . . . love him very much [and] . . . want to adopt him so that there is not a chance that he would be able to be placed anywhere else. They expressed that the minor's life comes first in the home now."

As to the mother, the report stated that she had been released from her in-patient drug program in March of 2012 and had begun visiting her son on a daily basis. The grandparents reported that "[t]he visits ha[d] gone well without incident and mother is always appropriate with Raymond." Although the child was aware that mother was his "birth mother . . ., [his grandparents] ha[d] always been the [child's] main caregivers."

14

DCFS concluded that the maternal grandparents "continue to adequately meet [the child's] needs and have his best interest at heart. Their home study has been approved and they are ready to proceed with the permanent plan of adoption." DCFS recommended that the mother's parental rights be terminated and that "adoption remain the permanent plan of the child."

### 2. *Mother's section 388 petition and the section 366.26 hearing*

On the morning of the section 366.26 hearing, mother filed a section 388 petition requesting that the court modify its prior order terminating reunification services based on changed circumstances. In describing the "changed circumstances" that justified a modification, mother's petition stated: "I started working I finished my program and my parenting certificate. I have my own place and I am still complying with orders." The petition also asserted that reinstituting reunification services would be beneficial to Raymond because "I am his mother and I believe I have changed and done everything asked of me in order to be with my child again. And I will never give up." The petition was unaccompanied by any additional evidence.

At the beginning of the section 366.26 hearing, the court noted that mother had filed a petition "asking for the court to reinstate reunification services." The court stated that it had denied "a hearing on the 388 based upon the fact that it did not promote the best interest of the child. The mother still has unmonitored visits after two years and also that there's no legal basis to reinstate [family reunification] at a [section 366.26] hearing." A subsequent written order confirmed the court's oral ruling, indicating that the section 388 petition had been denied for three reasons: (1) "the propose[d] change of order . . . does not promote the best interest of the child; (2) "no legal basis to reinstate [family reunification] at [a section 366.26 hearing]; and (3) "mother still has monitored visits after 2 years."

After ruling on the section 388 petition, the court proceeded with the section 366.26 hearing. The mother testified that, during her visits with Raymond, they normally "played"; "watched movies sometimes" and "just spent a lot of quality time together . . .

15

as much as we could." The court asked mother to describe what activities she did with the child that she "consider][ed] to be a parental role[.]" Mother explained that she was "involved in his life or was able to tell him what's wrong, what's right . . . . I would ask him to count for me. . . . I always asked him to sing his A.B.C's and just go over the simple things that he is learning in school right now." Mother also stated that, after being released from the recovery center, she visited the child for several hours most days of the week and all day on the weekends. Her weekend activities with the child included "play[ing] outside", "swimming" and "eat[ing]." Mother also stated that the maternal grandparents allowed her to give Raymond baths at their home and kept her up to date on how the child was performing in school. Finally, mother stated that although her parents had "pottie trained" the child, she "was there" when some of the training occurred.

During DCFS's cross-examination, mother admitted that since being released from the recovery center, she had stopped attending narcotics anonymous and alcoholic anonymous. She also admitted that she had recently been laid off.

After mother completed her testimony, her attorney argued that her parental rights should not be terminated because the evidence showed she was "exercising a parental role with [the child] . . . She's very aware of [his] schooling. She anticipates [sic] in the A.B.C's and number counting with Raymond. . . . She is very aware of how Raymond is doing currently in preschool. She does check up with the grandparents to make sure Raymond is progressing properly and also addresses all the behavioral issues that Raymond has in the preschool."

Raymond's attorney, however, stated that she was "aligned" with DCFS's recommendation to terminate parental rights. The attorney explained that "although mother had made great progress . . . [and] maintained consistent contact, I do have concerns about mother's stability and what this means for Raymond. Mother testified that although she did get laid off in May. . . [and] hasn't continued attending meetings. I think that due to Raymond's young age, it is very important for him to remain stable, and he has remained stable with his grandparents for the last two years." DCFS agreed,

16

arguing that "mother hasn't met the exception to adoption in this case.  She visits with Raymond, but . . . she doesn't have the parental responsibility for him.  It's her parents."

The court terminated parental rights and selected adoption as the child's permanent plan.  The court explained that although mother had "clearly maintained regular and consistent visitation and contact, and . . . even has taken on a parental role during much of those visits . . . the problem is that when it gets to balancing whether the extent of the mother's parental role and relationship outweighs the benefits in permanence of adoption."

The mother appealed the trial court's orders denying her section 388 petition and terminating her parental rights.

## DISCUSSION

Mother raises two issues in this appeal.  First, she contends that the trial court erred in denying a hearing on her section 388 petition.  Second, she contends that the evidence demonstrates the existence of "a beneficial [parental] relationship . . . which would prevent the termination of her parental rights."

### A. *The Trial Court Did Not Abuse its Discretion When it Denied the Section 388 Petition Without a Hearing*

Mother argues that the trial court erred when it denied her section 388 petition without holding an evidentiary hearing.  We review this decision for abuse of discretion. (*In re Angel B*. (2002) 97 Cal.App.4th 454, 460 (*Angel B*.); *In re Anthony W*. (2001) 87 Cal.App.4th 246, 250 (*Anthony W*.) ["We review the juvenile court's summary denial of a section 388 petition for abuse of discretion"].)

#### 1.  *Summary of applicable law*

Section 388 provides, in relevant part:  "(a) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to

17

change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence which are alleged to require the change of order or termination of jurisdiction. . . . [¶] (d) If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . ., the court shall order that a hearing be held . . .”

Under section 388, “[t]he parent seeking modification must ‘make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]’ [Citation.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.].” (*Anthony W., supra,* 87 Cal.App.4th at p. 250.) Although “the petition should be liberally construed in favor of granting a hearing to consider the parent’s request, . . . [¶] if the liberally construed allegations of the petition do not make a prima facie showing of [both elements], the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.” (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).)

“Conclusory” allegations are insufficient to establish a prima facie showing. (*Anthony W., supra,* 87 Cal.App.4th at p. 250.) Rather, the parent must provide “‘specific allegations describing the evidence constituting the proffered changed circumstances or new evidence. . . .’ [Citation.] Successful petitions have [generally] included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence.” (*Ibid.*) When assessing a section 388 petition, the juvenile court may consider the entire factual and procedural history of the case. (*In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450-1451.)

18

2. *Mother failed to make a prima facie showing that reinstating reunification services would be in the best interests of the child*

The trial court summarily denied mother's section 388 petition because she failed to make a prima facie showing on the second element. Specifically, the court found that mother had failed to make a prima facie showing that reinstating reunifications services would be in the best interests of the child.[7]

"Whether [m]other made a prima facie showing entitling her to a hearing depends on the facts alleged in her petition, as well as the facts established as without dispute by the court's own file (e.g., [the child's] age, the nature of her existing placement, and the time she came into care as a dependent child)." (*Angel B*., *supra*, 97 Cal.App.4th at p. 461.) The mother's petition asserts that modifying the court's termination of reunification services would be in the best interest of the child because "I am his mother and I believe I have changed and done everything asked of me in order to be with my child again. And I will never give up." The petition does not include any declarations or other forms of evidence that expand on these conclusory assertions, nor does it cite to any evidence in the record.

The juvenile court's file shows that Raymond was only two-years old when he was detained from mother and placed in the custody of the maternal grandparents. During the two years that passed between the child's detention and the section 366.26

---

[7] Mother argues that we should reverse the denial of the section 388 petition because the court erroneously concluded that it did not have authority to reinstate reunification services at a section 366.26 hearing. In support, mother cites language from the court's denial order stating: "no legal basis to reinstate [family reunification] at a [section 366.26] hearing." Mother contends that because a juvenile court may, upon a proper evidentiary showing, grant a section 388 petition at a 366.26 hearing, we must reverse and remand for reconsideration. We find no merit in this argument under the circumstances in this case. The court's oral ruling at the section 366.26 hearing and its subsequent written order made clear that the primary reason it denied the petition was because mother had failed to demonstrate that modification would "promote the best interests of the child." This was a proper basis for denial. (See *Anthony W., supra,* 87 Cal.App.4th at p. 251 [affirming denial of full hearing where "mother's petition d[id] not demonstrate how a change in the order would be in the best interest of these children"].) Accordingly, even if the court erred as to the other ground, there is no basis to reverse.

hearing (July 2010-July 2012), mother was incarcerated for five months (October 2010 to March 2011) and did not visit the child or contact DCFS for an additional three months. In March of 2011, the child's therapist indicated that "he was not doing well" and suffered from anxiety caused, in part, by mother "being in and out of his life." After several months under the care and custody of the maternal grandparents, however, the child became "much less anxious and preoccupied with concerns about his mother's love" because he had developed "secure relationships with family members who meet his social emotional and developmental needs." Although the record indicates that mother's visits became more consistent and meaningful after she became sober, she never had unmonitored visits.

DCFS reported that Raymond was "thriving in the home of maternal grandparents" and saw them "in the role of parents." DCFS also reported the maternal grandparents "love[d] Raymond very much . . . and have cared for him in their home since he was born. They are attached to him and are committed to meeting his needs on a permanent basis through adoption. . . ."

In *Angel B.*, *supra*, 97 Cal.App.4th 454, the court affirmed the summary denial of a section 388 petition under similar circumstances. The parent in *Angel B.* had a "long history of drug abuse" and had "tried to rehabilitate herself, without permanent success, on a number of occasions." (*Id*. at p. 459.) After the juvenile court terminated the parent's reunification services, "[s]he enrolled in a residential drug treatment program, consistently tested clean for four months, completed various classes, and even obtained employment. She had regular visits with [the child], which went well. As a result, she petitioned the juvenile court pursuant to section 388 to either grant her supervised custody of [the child], or grant her reunification services." (*Ibid.*)

The petition was accompanied by a declaration providing information about the mother's rehabilitation program, the nature of her completed individual counseling, her future employment plans and the frequency and quality of her visits with her child. The juvenile court, however, "summarily denied the petition without an evidentiary hearing,

and thereafter her parental rights were terminated." (*Angel B.*, *supra*, 97 Cal.App.4th 454.)

The appellate court affirmed the summary denial based, in part, on mother's failure to demonstrate that modification would be in the best interests of the child. The court explained that, after reunification services have been terminated, "there is a rebuttable presumption that . . . stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 465.)

The court concluded that mother's petition had failed to allege any such facts: "The facts presented by the . . . petition show that [m]other is doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with [the child]. In addition, we shall assume, for the sake of this appeal, that this time her resolve is different, and that she will, in fact, be able to remain sober, remain employed, become self-supporting and obtain housing. Even so, such facts are not legally sufficient to require a hearing on her section 388 petition." (*Angel B.*, *supra*, 97 Cal.App.4th at pp. 464-465.)

The court also noted that it would have been extremely difficult for mother to make a prima facie showing that reinstatement of services would be in the child's best given that the adoptive parents had raised the child since infancy: "The [caretakers] clearly, by deed if not by name, were [the child's] parents. They, not [m]other, provided [the child] with all the day-to-day, hour-by-hour care needed by a helpless infant and then growing toddler. Thus, although [m]other's petition states that she has bonded with [the child], and that [the child] is happy to see her and reaches for her on their visits, such visits, in total, add up to only a tiny fraction of the time [the child] has spent with the foster parents. . . . .[¶] Perhaps if [the child] were not adoptable and [m]other was the only mother-figure in [the child's] life, and [the child's] only hope of having a family in the future, the result might be different. [Citation.] But those are not the facts presented

21

here. . . . [T]he juvenile court did not abuse its discretion by denying the section 388 petition with no hearing." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 465.)

This case shares many similarities with *Angel B.* The record indicates that mother had a drug abuse problem for many years and was "unable to remain sober even when the stakes involved . . . the loss of [custody] of her . . . child." (*Angel B., supra,* 97 Cal.App.4th at p. 463.) Raymond has spent his entire life in the home of the maternal grandparents, who served as his primary caretakers even before he was detained from mother. According to Raymond's therapist, the child has benefitted greatly from the stability that his grandparents have provided.

Although mother has made significant improvements since she became sober, these improvements came only after the termination of reunification services. Moreover, mother did not file her section 388 petition until "the eve of the section 366.26 permanency planning hearing," at which point "the child['s] interest in stability was the court's foremost concern." (See *In re Edward H.,* (1996) 43 Cal.App.4th 584, 594 [affirming summary denial of section 388 petition filed "on the eve of the section 366.26 permanency planning hearing" because "at [that] point in the proceedings . . . the children's interest in stability was the court's foremost concern and outweighed any interest in reunification"].)

In sum, the trial court did not abuse its discretion in concluding that the vague and conclusory statements in the mother's petition, considered in conjunction with evidence in the record, did not establish a prima facie showing that the child would benefit from reinstating reunification services.

### B. Substantial Evidence Supports the Juvenile Court's Finding that Mother Did Not Have a "Beneficial Parental Relationship"

Mother also argues that the juvenile court erred when it failed to apply the "beneficial parental relationship exception" to avoid the termination of her parental rights. (See § 366.26, subd. (c)(1)(B)(i).)

*1. Statutory framework and standard of review*

"'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53 (*Celine R.*).)

At the section 366.26 stage of a dependency proceeding, adoption is the preferred choice. (*Celine R., supra*, 31 Cal.4th at p. 49; § 366.26, subds. (b) & (c).) "If it is likely the child will be adopted, the court must choose that option–and as a result terminate the natural parents' parental rights–unless it 'finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of [several] specified [statutory] circumstances.' [Citation.]" (*Celine R., supra*, 31 Cal.4th at p. 49; (§ 366.26, subd. (c)(1)(B).).) These "specified statutory circumstances–actually, exceptions to the general rule that the court must choose adoption where possible–'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.]." (*Id.* at p. 53.)

Section 366.26, subdivision (c)(1)(B)(i) establishes an exception to the adoption preference where the court finds, by substantial evidence, that "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).) "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.]" (*Angel B., supra*, 97 Cal.App.4th at p. 466.) "No matter how loving and

23

frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy 'a parental role' in the child's life.' [Citations.]" (*K.P., supra,* 203 Cal.App.4th at p. 621.) "That showing [is] difficult to make in the situation . . . where the parents have . . . [not] advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

"Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*K.P., supra,* 203 Cal.App.4th at p. 621.)

On appeal after a court has rejected a parent's effort to establish the exception, two different standards of review apply. (See *K.P., supra*, 203 Cal.App.4th at pp. 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Since the parent must first show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence.[8] (See *K.P., supra,* 203 Cal.App.4th at p. 621.; *Bailey J., supra,* 189 Cal.App.4th at p. 1314).) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.) Thus, unless the undisputed facts establish the existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be

---

[8]     The juvenile court's statements at the section 366.26 hearing indicate that it found that mother had failed to establish the existence of a beneficial parental relationship within the meaning of Section 366.26, subdivision (c)(1)(B)(i). Although the court noted that the mother had recently maintained regular visitation and engaged in some activities that were consistent with a parental role, it concluded that she had failed to show that "the extent of the [her] parental role and relationship outweighs the benefits in the permanence of adoption." (See *K.P., supra,* 203 Cal.App.4th at p. 621.)

24

detrimental."  (§ 366.26, subd. (c)(1)(B); *K.P., supra*, 203 Cal.App.4th at p. 622.) Although grounded in the facts, the court's determination on this issue is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]  Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."  (*Bailey J., supra*, 189 Cal.App.4th at p. 1315; see also *K.P., supra*, 203 Cal.App.4th at p. 622.)

### 2. *The trial court's finding that there was no parental relationship is supported by substantial evidence*

The juvenile court's finding that mother failed to establish the existence of a beneficial parental relationship is supported by substantial evidence.  Some of the factors that are "considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs."  (*Angel B*., *supra*, 97 Cal.App.4th at p. 467.)

The record shows that Raymond was detained from mother when he was only two years old and has spent nearly half his life in the legal custody of his maternal grandparents.  Even prior to the child's detention, the maternal grandparents had served as his "main caregivers" and had "been caring for him since he was born."  The child spent his entire life in the grandparents' home and "s[aw them] in the role of parents."

The record also contains evidence that mother's interactions with Raymond frequently had a negative effect on the child.  On numerous occasions, mother became "angry" or "emotional" during her visits, which "upset" the child.  DCFS reported that, even after detoxifying from methamphetamine, mother continued to "act out in front of her son . . . which [wa]s upsetting to him."

25

Although the quality of mother's visitations improved following the completion of her drug treatment program, she never "advanced beyond supervised visitation." (See *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523 (*Jeremy S.*) [establishing parental relationship exception difficult "where the parents have . . . [not] advanced beyond supervised visitation"] [overruled on other grounds *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414].)

In March of 2011, Raymond's therapist reported that the child was suffering from "anxiety" caused by "his mother being in and out of his life so often," was "preoccupied with concern that his mother might not love him" and "feared being separated from his caregivers." The child's condition greatly improved under the care of the maternal grandparents, who provided a "secure relationship" that the child was previously lacking.

Finally, the mother has pointed to no evidence indicating that the child "has any particular needs that can be met by [m]other but not by the [adoptive maternal grandparents]." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 468 [mother's failure to identify any needs that could not be met by adoptive parents supported juvenile court's finding that the parental relationship exception did not apply].) The DCFS reports make clear that Raymond has thrived under the care of his maternal grandparents, who have "done an excellent job of meeting the minor's needs" and are "committed to meeting his needs on a permanent basis . . . ." Considered collectively, this evidence supports the juvenile court's finding that no sufficient parental relationship existed between the mother and the child.

Mother, however, contends that the undisputed evidence shows that she did in fact play "a parental role" in Raymond's life. In support, she relies on evidence showing that, during her monitored visits, she would "play with [the child], spend quality time with him, teach him right from wrong, to count, sing his ABC's and go over what he was learning in school. " She also cites evidence showing that she would "go swimming with him, . . , play puzzles . . . bathe him" and "was well informed of [his] activities." Additional evidence in the record indicates that mother had a "strong bond" with the child and displayed a "loving [attitude] towards" him.

However, to meet the burden of proving that the beneficial relationship exception applies, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 229.) "One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life." (*Jeremy S.*, 89 Cal.App.4th at p. 523.) For the exception to apply, the parent must show that the "child's relationship . . . transcend[s] the kind of relationship the child would enjoy with another relative or family friend." (*Ibid*.) Although the evidence in the record suggests that mother acts lovingly toward Raymond and that the child may derive some benefits from their time together, mother has failed to present any evidence that the relationship has advanced to the point of "meet[ing] the child's need for a parent." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [exception does not apply where "the natural parent has maintained a relationship that may benefit the child to some degree but does not meet the child's need for a parent"].)[9]

## DISPOSITION

The juvenile court's orders are affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.                    JACKSON, J.

---

**9** Because we conclude that substantial evidence supports the trial court's finding that there is no beneficial parental relationship, we need not address "[t]he second determination in the exception analysis," which "is whether the existence of [a beneficial] relationship . . . constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citation.]" (*K.P., supra*, 203 Cal.App.4th at p. 622.)

27